Our second case for hearing is 23-1457, Vanda Pharmaceuticals v. Centers for Medicare & Medicaid Services. Mr. Hughes. Thank you, Your Honor. May it please the Court, Paul Hughes for Vanda Pharmaceuticals. I tend to begin with three arguments. First is the text. Under the statute, the line extension in the original product must be the same drug. A new product under a different new drug application is not the same drug as the original, and it's not a line extension. Second are the reliance-based interests. CMS failed to undertake the required analysis to change policy. Third is the government's ratification argument. It simply does not work for a host of reasons. And if I have time, I'd like to touch on the oral solid dosage issues. Of course, I'm happy to begin anywhere the Court may wish to direct. Turning, though, first to the text, we think the meaning of the term drug in the statute compels our construction, because if a new product is under a different NDA, it is not the same drug as the original and cannot be a line extension. Now, I think it's notable that the government advanced this argument itself in the Ipsen Biopharmaceuticals case, which the D.C. District Court in that case accepted. We think that's correct. Our argument really proceeds in two steps. The first step, I don't think the government disagrees with us on. That's the new formulation must be the same drug as the original drug to qualify as a line extension. That comes from the provision of the statute that I'll call 8C2C. And the text is the term line extension means, with respect to a drug, a new formulation of the drug. The second critical argument where we in the government disagree is what is the meaning of the drug in this context? The government's position is that drug refers to the chemical compound or the pharmaceutical chemical active ingredient. Our position is that drug refers to the legal concept of a drug under the Food Drug Cosmetic Act. I think our construction is correct because that's how it's expressly defined in the relevant definition terms. And I'll work the court through that in just a moment. But I mean, is the government's interpretation at least a reasonable interpretation of the statute? Or are we in Chevron land to the extent that it's still breathing? Well, a few things about Chevron, Your Honor. First, I think it's notable the government has never invoked Chevron in their briefs. So I don't think they make a Chevron-based argument. As the Supreme Court's recently informed us, it is a canon of construction that is the government's to waive if they wish. And they've not articulated a Chevron argument. I think that may be because of certain cases going out the Supreme Court. I have a question. Even if Chevron is thrown out the window, do we still owe some deference to an administrative ruling under the Administrative Procedure Act? Because one of the phrases that's used is arbitrary or capricious. And so, I mean, I would just say perhaps Chevron is not the only source of deference to an agency. Perhaps the Administrative Procedure Act is to some extent as well. Well, Your Honor, I think that conflates two different aspects of the APA. Certainly there are claims, and we have claims in this case, that CMS's action is arbitrary and capricious. But our statutory argument proceeds under a different prong of the APA, which is contrary to law. And our principal presentation with respect to the statutory definition is that this is just contrary to the plain meaning of the text. And if we're correct in that submission, I don't think deference is due. Again, if we think of a Chevron framework, we're in step one. But, again, I don't think that the agency has a range of reasonableness in construing the statute if we're correct that the statute compels our conclusion. And, again, it's notable the government's position that this refers to a chemical entity. There are other definitions in this very same section, and we point the court in our brief to K7C Romanet 1 that discusses the same active drug ingredient. That is, though, how CMS wishes to construe this statutory text, but this text is quite different. And to work the court through that, the text requires that the original drug, and I'm now referring, I'm sorry for all the citations, but just trying to be precise, C2C Romanet 1. The original drug has to be, quote, unquote, either a single source drug or an innovator multiple source drug. So the original drug has to be one of those two things. Those two things are expressly defined by the statute. So single source drug is K7A Romanet 4, and it defines a single source drug, means a covered outpatient drug, skipping over some of the relevant part, which is produced or distributed under a new drug application approved by the Food and Drug Administration. So that is what a single source drug is. An innovator multiple source drug has a similar reference to a new drug application. This is critical because the Food Drug Cosmetic Act defines what it means for something to be a drug for these purposes. The minor- not with safety so much as the amount of the rebate owed by the manufacturer. Aren't they different? Don't those two statutes have different focus? Yes, Your Honor, but what happens in this statute is Congress, very specifically for its construction of what a drug is, incorporated the understanding from the Food Drug Cosmetic Act. It did so explicitly, again, in K7C1 and then, or sorry, K7A2 and 4. Those are the critical provisions where it cross-references the Food Drug Cosmetic Act. And I think that's a very relevant understanding because when a drug innovator goes to FDA, there are two principal kinds of submissions. A new drug application says we have a new drug that we want reviewed as a new drug that is not an existing drug. Then there are more minor modifications which proceed as supplemental new drug applications. A supplemental new drug application, by law, is not for a different drug. It is for a new drug. And so there are very clear legal concepts between what a old drug is and what a new drug is under the Food Drug Cosmetic Act. And again, to be clear, it's not us saying the court should look— In a nutshell, why do you—exactly what is so— you want a narrow definition of the term line extension. Now, what makes your drug so different that it is outside the broad definition of line extension that the agency is arguing for? Tell me what features. Well, to be clear, Your Honor, our fundamental submission is that the agency's definition of the regulation is wrong, and that's why we're here. We think it departs from the statute. What features of your newly issued drug are so different that it could not be considered a line extension? So we both have a facial challenge that we think is broadly wrong, but as applied, we discuss both one drug that we have approved and one drug that's under investigation. The drug that's approved is Hetlios and Hetlios LQ. Hetlios was initially a drug that was approved for non-24. It was the first and only treatment. It was an oral solid dosage form. Vanda then began studying Hetlios for use in a very different patient population for Smith-McGinnis syndrome. It's a very rare population that has significant pediatric effects. Vanda had to undertake significant research to make it available for that new indication, but very importantly, they had to fully reformulate the drug and change it from a capsule form to a liquid formulation. Now, when Vanda went to FDA, initially they presented it as a supplemental new drug application. FDA said, no, that's incorrect. We're going to reclassify this as a new drug application because under the Food Drug Cosmetic Act, these changes are so significant. It is no longer the same drug that you've previously marketed under your existing new drug application. It is now a different drug under a new NDA, and because it's under that new NDA, it required a different kind of approval process through the FDA. Mr. Hughes, can I follow up on that question? And you just raised the issue of innovation. You said that your client had invested a substantial amount of money, or at least your brief does, in developing this new, you call it, a new drug, not a line extension. And I get that, and obviously that's not an illegitimate concern. We want to incentivize drug manufacturers to take on what can often be a perilous and sometimes unprofitable venture. But as I understand the government's response to that, they say that you can recoup those costs by setting the price as high as you want for this new version of the drug they call a line extension, and that's sufficient to incentivize innovation. But what you can't do, but going forward then, you can't increase the cost of the original drug beyond the rate of inflation, and that's where the rub is. First of all, do you agree with that premise? And if you don't... No, I think it is a little off for an important reason. And again, this is about our last arbitrary and capricious innovation argument, which... But I think it's related to whether or not this view of the statute is reasonable to counter the suggestion that somehow the sky is going to fall if we don't read the statute the way you do. Right, and what happens is if this is a line extension, I don't believe one has the ability to set a new base date when it produces this new drug if there has been an improvement or an increase over the inflationary rate from the original underlying drug. And so what happens in circumstances like this, Vandette engaged in very, very expensive research and development for this and the other drugs in its pipeline, like FNAP, long-acting injectables, the other drug that's under development, because there has been an increase beyond the rate of inflation with the original drug, the Hetlios drug. The penalty inflation, the additional inflationary amount, essentially means that the company can't set any price that it wants and recoup that because the Medicaid rebates essentially are structured so that it will receive effectively nothing in Medicaid payments for these drugs. Now, for the SMS population... You said that the line extension, the only thing that was a line extension that was... It had to be... Line extensions only covered meaningless changes in the drug. I think that's out of your brief, that a line extension was meant to apply only to meaningless changes. And I'm wondering where you get that from the statute. Let me be very precise. Where does that terminology of meaningless changes come from? Your Honor, let me be very precise about the rule that we're urging. What's that? I want to be precise about the rule we're urging this Court to adopt if it was not clear from our brief. We think there are two textual limitations that stem directly from the statute that we're asking the Court to adopt. Where do you get the idea that a line extension applies only to meaningless changes and nothing more? Your Honor, I don't think that's what we're advocating. And if our brief suggests otherwise, I apologize. We said minor modifications is from the legislative history and what Congress is doing. But we do have very two clear textual limitations that we urge, and that's the rule that we believe the text identifies. The first is what we talked about earlier, that if a new drug is under a new NDA, it is a different drug and cannot be a line extension. That's the first very clear textual limit. And if I may, Your Honor, may I touch on the second? The second textual limitation is the oral solid dosage. We believe that as CMS for eight years, from 2012 to 2020, believed the statute is best read that is a change from an oral solid dosage to a different oral solid dosage. We think both of those two stem directly from the statutory text. And that's, Your Honor, to be clear, is the rule that we're advocating. Those are the two textual limitations that we think this regulation transgresses and that we ask the Court to adopt. We don't ask for a more nebulous standard like meaningless. And I just want to be clear about what it is that we think the text requires. Before you sit down, I will ask my colleagues, and Judge Motz in particular, if she has any questions. No, thank you, Judge. Great. Thank you, Ms. Peters. Mr. Peters? Good morning, and may it please the Court. David Peters on behalf of the United States of America. I'd start with where Judge Wilkinson ended his question. Plaintiff's challenge to the CMS rule rests on a basic premise. The line extension provision by its plain terms applies to, quote, and this is from page 35 of Plaintiff's opening brief, meaningless changes to existing products and nothing more, end quote. That premise cannot be squared with the statutory text that Congress enacted in 2011 because the example that Congress gave of a covered line extension drug was an extended release formulation, which, as Plaintiff's own products illustrate, often includes substantial changes to existing products and, if this is critical to the main textual point that plaintiffs have made, often require separate FDA approval under a new drug application. The premise also cannot be squared with the 2016 amendment, which carved out abuse deterrent formulations but not other similar products from the line extension provision, thereby making clear that Congress understood that the statute's plain terms apply to more than meaningless changes to existing products. One thing, just trying to step back a bit, the center CMS is in charge of this Medicaid rebate statute and Congress has essentially delegated to you a significant amount of authority with respect to the rebate program, and I am concerned that if we adopt a very narrow view of what a line extension is and that's what your opponent wants and has made some interesting arguments, but this narrow view that your opponent is arguing for in practical terms, I wonder whether that wouldn't decimate the need for rebates that the manufacturer pays to the government, and if we adopt this very narrow view of what a line extension is and it only applies to meaningless changes, it seems to me that the implications for rebates and the government's efforts to provide for, you know, to make sure that the government isn't cheated out of the best price, I wonder if the implications here would be quite serious, if not devastating, but quite serious for the rebate program and we have a very serious crisis or problem on our hands because health care costs with the aging of the population, which is what Medicare and Medicaid covers, they're going through the roof, both because of the number of people that are getting older and a higher percentage of the population is older, and there are also health care improvements, which as wonderful as they are, are very expensive, and if on top of all this we were to say, well, the definition of line extension is so narrow that only encompasses meaningless changes, I'm just worried about whether that would decimate rebates and pose a significant problem to the mandate of CMS to try to put some modest and minimal control on these skyrocketing health costs. That's just what I'm thinking of, and Congress expected CMS, Congress expected CMS to exercise some modest control over it. But that's the whole point of the rebate. Your Honor, exactly right. The purpose of the Medicaid rebate program is to guard against rising drug prices, and if Congress had wanted to limit the rebate program to meaningless changes, it could have said so, but the language that Congress enacted in 2011 was that a line extension is a new formulation and an example of a new formulation is an extended release formulation, so the exact example that Congress gave is a type of drug that is not... That's what part of the new formulation is. It is a drug that is, it is a change to a drug that is not necessarily meaningless, and we know that because Congress gave an example of a change to a drug that is not necessarily meaningless. The issue is if a new formulation includes, not exclusively, an extended release formulation, and an extended release formulation can differ in some material respects from the original drug, and if it includes, if a new formulation includes an extended release mechanism, then the term must be pretty broad. It must be broader than meaningless changes, Your Honor. It must be broader than meaningless changes. But the counterargument to that, which this gentleman is making, is that that's not really his position, that it was just a line in the brief. But, Your Honor, Plaintiff's opening argument today was that Congress has implicitly read into the definition of line extension limitations that a separate regulatory scheme draws through the FDA, but the example of a new formulation being an extended release formulation also puts paid to that idea, because an extended release formulation oftentimes involves changes to dosage forms or delivery mechanisms that, under the FDA's... It can be pretty significant, and it suggests that a new formulation is a broader term than our friend on the other side would have it. But even more than that, Your Honor, it also shows that it cannot be the case that Congress meant to limit new formulations only to those same drugs that are approved under one stand-alone new drug application, because extended release formulations oftentimes must be approved under a separate stand-alone new drug application. So it can't be the case that there is a limitation that is read into the statute that the example that Congress gave would contravene oftentimes. And so that just is quite clear that the separate FDA regulatory scheme is selectively incorporated into the Medicaid rebate program, amongst other things, to ensure that the United States pays rebates only for drugs that are covered and approved to distribution by FDA. But it... I suppose that the exception for an abuse deterrent, I guess your argument is that that illustrates the broad residual power that adheres in new formulation, that the broad residual power is the fact that the line extension covers the new formulation and that the abuse deterrent formulation is a narrow exception to a broader residual power. And the reason Congress made the amendment in 2016 was precisely because the definition of new formulation applied broader to meaningless changes. What are you suggesting in terms of... Are you asking that your position be upheld based on the 2020 regulation or on the ratification, the quote ratification, if it is that, in this statute? And are there dangers in relying upon the ratification? Are we changing the rules on the drug manufacturers in midstream and statutory ratifications of regulations might run into some questions from the Supreme Court about giving agencies undue authority? So what are you asking? For a decision based on the ratification or a decision based on the initial reg? The text and the subsequent acts of Congress here all point in the same direction. So again, we said that it was plaintiff's claims are inconsistent with the 2011 text as enacted. It's inconsistent with the 2016 amendment. And so plaintiff's claims failed the moment they were filed. But it's telling that where Congress in 2016 thought the line extension provision was applying broader than it should, it stepped in and made an amendment. And then contrast that with what Congress did in 2022 where it passes mere months after CMS gives an authoritative interpretation of these provisions for the very first time and it enacts a provision as part of the new Medicare rebate program, a line extension provision that is verbatim taken from the Medicaid provision. And that's just a clear indication that Congress understood and approved of the interpretation that CMS gave. Now, Judge Diaz, I... Oh, sorry, Judge Monson. No, excuse me. And I think that's a worthwhile point. But it doesn't end the inquiry for us, right? We still have to be sure that the regulation is consistent with the plain language of the statute. Yes, the ratification just... The argument about the subsequent congressional acts in 2022 is just a further indication that Congress... But it doesn't resolve that. Here, Your Honor, the statutory text, the subsequent acts of Congress both in 2016 and 2022 all point in the same direction, which is that this implicit limitation that plaintiffs are attempting to read in from the separate regulatory scheme of the FDA just isn't supported by the text of the statute. So maybe you can walk me through the statutory analysis that supports you. I'm happy to, Your Honor. So if you look at the definition of line extension, which is in 1396R-8C2C3. As my friend said, it's a complicated regulatory scheme. It says, the term line extension means with respect to a drug, a new formulation of the drug, such as an extended release formulation. And so what the plain text is saying is that a line extension means with respect to an originating drug like Phanapt, a new formulation of that originating drug, Phanapt, as opposed to some other originating drug like Heliots. And so all this is telling you is that when you were looking at whether a drug is a new formulation, you go back to whether it's a new formulation of the originating drug. That's all. And we know that because the example they give is an extended release formulation, which oftentimes entails meaningful changes to a drug and oftentimes includes changes that under FDA's separate regulatory scheme requires approval under a stand-alone new drug application. So if plaintiff is right that Congress really meant to read into the statutory term some implicit limitation, it wouldn't make any sense that the example they gave of a covered line extension drug is an extended release formulation, which doesn't comport with any of their interpretations of the statutory provisions. To go back to Judge Diaz's question, plaintiffs also misunderstand how the rebate provision works. When a new line extension drug is introduced to balance the needs of ensuring that manufacturers can engage in innovation and recoup the cost of innovation, a manufacturer can set the initial price of a line extension drug at whatever it wants. It can set it at $1 or $10 or $10,000. It's the manufacturer's choice. All that this provision of the rebate scheme says is if you increase your prices at a rate that outpaces inflation, you have to compensate Medicaid for that fact. That's it. The line extension provision... After the initial price is set. After the initial price is set, which can be set at whatever the manufacturer needs to recoup its cost, and presumably at that point, it's done the innovation, it knows what it needs to recoup the cost. Now, the line extension provision is a slight modification on that and just says, if the originating drug has outpaced inflation, then you might have to pay a rebate because the original drug has outpaced inflation. But it all goes back to the same point, which is that Medicaid should not be paying for price increases that manufacturers elect to undertake at a rate that outpaces inflation and that in those situations, they owe a rebate for that amount. Even their argument is, I guess, that such a rule inhibits scientific exploration of new procedures in your drug. But I guess your answer is, so what? We're talking about reimbursement here. Is that what your answer is? The Medicaid scheme is about ensuring that Medicaid doesn't pay too much for drugs. And so the point is to have a rebate scheme. If Congress wanted to limit the coverage of drugs to those that are, you know, some level of innovation or some level of change, it could have done so, but it didn't do so in the statutory text. And so there's no need to read into a limitation that doesn't exist. But even when manufacturers raise this question about innovation in the course of the rulemaking, CMS explained that there are any number of factors that go into whether a manufacturer will engage in innovation. A rebate obligation is just but one of them. And in any event, a manufacturer never, ever has to pay a rebate obligation under the inflation-based rebate as long as its prices are kept in line with inflation. And so there isn't any penalties that attach to a drug being a line extension if it's the manufacturer's choice to raise its prices at a rate that outpaces inflation. Apologies. The interesting thing is when you compare the language of the regulation and the statute, there's just a very high degree of similarity to them. I mean, both the regulation and the statute say that line extension includes a new formulation of the drugs, and then they give an example of an extended release formulation as being a new formulation. And then they have the same abuse deterrent exception. So the definition of line extension, and I was including a new formulation, and new formulation including, among other things, an extended release formulation, both the statute and the reg exhibit a very high degree of similarity. So if we... I'm worried if we overturn this, we'd be overturning Congress's understanding and the agency's both. Your Honor, I take plaintiff's challenge to be to the definition of new formulation. So the definition, the regulatory definition of line extension just isn't mirroring the statutory text, as you pointed out. What I imagine plaintiff will say is the challenge they are bringing is the definition of new formulation, which is means for a drug, a change to the drug, including but not limited to an extended release formulation, which is the example that Congress gave, or other changes in release mechanism, a change in dosage, form, strength, route of administration, or ingredients. But the example of an extended release formulation, which is the type of change to a drug that can have substantial effects and can have meaningful therapeutic effects, as plaintiff's own products illustrate, indicates that these are the types of changes that Congress contemplated being new formulations of a drug. And it just doesn't matter whether those changes would have different treatment under the FDA's regulatory scheme, because Congress didn't incorporate wholesale the FDCA and the FDA's implementation of the FDCA into the Medicaid program, because the Medicaid program's purpose is different, which is to rebate, it's about rebate and reducing costs to Medicaid and to states. I will stop. One more point. Plaintiff in passing mentions about the oral solid dosage form. So the line extension provision applies to a rebatable drug that applies to a line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form. That just means that the universe of drugs here that are covered are those that are originally in pill form. And why that distinction? Why doesn't it work the other way around? Congress, when it was enacting this provision, limited the scope of the line extension provision. I know it did. Why did it do that? And it did. The most common forms of drugs are pills, and so it makes sense that when Congress was discerning how the line extension provision was to be applied, it did so by saying it's only going to apply to those drugs that are originally in pill format, this universe of drugs, and not to drugs that are in the less common liquid or injectable form. And that's the most natural reading of the statute is that that modifier that is an oral solid dosage form applies to those two, what the original drug is, and isn't carried through to the earlier parts of the differently structured statute. And so all CMS did here was give effect to what the plain meaning of the statute is. I guess Judge Diaz was asking you, and I had the question too. I take it your answer is Congress made this distinction, but why is what the question was. But maybe you don't have an answer. Congress determined that it should be applied to one set of drugs, and it was very reasonable for it to include. I mean, plaintiff's position is that changes from liquid to pill form are different than changes to pill and liquid format sometimes, and so it was a perfect appropriate to say, well, we're just going to cheat all changes to pill format differently than we're going to cheat changes to liquid format or drugs originally in liquid format, and that was a perfectly reasonable line for Congress to draw, and if plaintiffs disagree, that's an issue for Congress. I see my time is up. If there are no other questions, we ask the judgment be affirmed. Thank you, Mr. Peters. Mr. Hughes? Thank you, Your Honor. First, I want to begin. I want to be clear. Our rule we're asking the court to articulate is not meaningless changes. It is the two very specific limitations that we believe the statute identifies that we presented. Second, abuse deterrent formulations are typically done via SNDA's supplemental new drug applications, not via NDA's. For example, in November 2017, FDA for oxycodone approved an extended release formulation. That was done via an SNDA. Similarly, extended release formulations, when you go from a two-a-day to a one-a-day, those are typically done via SNDA's. The opposing counsel made the point that an extended release formulation can include some pretty significant changes, including in dosages and treatment regimens and a number of other things. So the point he's making, I think, is that if an extended release formulation is a new formulation of the drug, then the definition must be fairly broad under the statute given the fact that an extended release formulation equating that with a new formulation, equating a new formulation to an extended release formulation under the statute must encompass a pretty good amount of things because extended release formulations are quite different sometimes from the original non-extended release. Well, I agree with that, Your Honor. I think the key dividing point is whether or not it is done under a supplemental new drug application or a new drug application. And I want to point the Court right to the statutory text because the provisions that my friend will refuse to talk to the Court about, my friend doesn't even reprint them in the statutory appendix to the brief, is the statutory definition of innovator-sourced drug and single-sourced drug. And those two statutory definitions, which, again, under the line extension provision that my friend points to, the original drug has to be either a single-sourced drug or an innovator-multiple-sourced drug. That is directly from the statute of the line extension. Those are defined terms. My friend will not even talk about those defined terms. Why? Because they specifically tell us what a single-sourced drug is, an innovator-multiple-sourced drug is. That is a defined term. And that is the term line extension. And that term is explicitly defined in the regulation and in the statute. So if we're going to be talking about defined terms, why wouldn't the definition in the statute and the regulation of line extension qualify as the most applicable and specific to our case? That's a defined term, and that's what we're trying to wrestle with. Because the term, Your Honor, that it uses is in turn defined. So the defined term that Your Honor's talking about is that text at the end of capital C. The term line extension means with respect to a drug a new formulation of the drug. That term, the drug, if you look up above, it says, in the case of a drug that is a line extension of a single-source drug or an innovator-multiple-source drug. It is telling you when it's referring to the drug, it's the original drug, that the text right above, when it's also defining line extension, is saying the original drug is a single-source drug or an innovator-multiple-source drug. That is what the drug in the line extension definition is referencing. And so the question is, when it's talking about the drug, and it earlier says the line extension, the original drug is a single-source drug or a multiple-innovator-source drug, what is the meaning of the drug? The government says, well, it's just the chemical entity, but in fact, this is a defined statutory term that specifically identifies the source of understanding what qualifies as the drug as the new drug application. And let me be clear, CMS made this argument in D.C. federal court just a few years ago in the Ipsen biopharmaceutical case. They prevailed on that argument. The D.C. district court identified that the distinction between a supplemental new drug application and a new drug application was the distinguishing feature for what qualifies as a drug in these purposes because at that time, it suited the government's purpose to make that argument. They were correct in making that argument. They're walking away from it here. Let me ask you this. It refers to something that Judge Diaz raised earlier that I thought was a good point. Very often, when pharmaceutical companies go head-to-toe with CMS, the argument is that the regulation is going to really dampen innovation. And I thought Judge Diaz had made the point that you can set the original, the price for an original drug as high as you want, and for a line extension, you can still raise the price as long as it keeps pace as long as it doesn't outstrip inflation. So what I'm saying, what I'm suggesting is doesn't the combined, in light of what Judge Diaz was talking about, doesn't the whole scheme strike a, the statute strike a balance between recoupment of, through rebates of costs, on the one hand, cost control, but also doesn't it provide, in the two ways I've just mentioned, room for innovation? Why isn't it, why isn't the whole scheme a carefully drawn compromise between cost control and innovation in the way that the Chief had talked about? Your Honor, because that's just not how it works with the line extension when it kicks in, because the additional rebate essentially negates any cost increase for the later in time drug, so there can be, as an effective matter with Medicaid, no cost increase. And we're talking about, for now, long acting injectable where 70 plus percent of the population is likely to be Medicaid. That means there's absolutely no incentive for a company to go out and do the tens of millions of dollars, hundreds of millions of dollars that they have to do to bring this product to market because they violate their fiduciary shareholder obligations to do that R&D when there's no way that they can possibly recoup that. What Congress, That's a good argument, but I'm still not sure why it doesn't belong in the lap of Congress. I'm telling you how one could reasonably read the statute and the regulation, and if you're dissatisfied with that and it puts a hamper on innovation and growth and the rest, and those may be perfectly decent arguments, but I'm just not sure that the statutory scheme gives us the authority to make those changes and why the balance that you're talking about isn't essentially a political issue because I'm not sure the statute gives us the authority to tinker with what's a very delicate, what is a very delicate balance between cost control and innovation. I wonder whether something like that and striking that balance isn't best left to the Congress. Judge Diaz, may I? Absolutely. Thank you, Your Honor. A few points about that. First, all we ask for the court to do is to enforce the statute as written by looking to those definitions, and again, if we look to what CMS argued in Ipsen Biopharmaceutical that the D.C. District Court accepted, that is principally what we are asking this court to do, and if this court were just to embrace that district court analysis that CMS urged on the district court then we would prevail. As to what Congress was up to, if you look at the CBO report, what happened was there were very specific examples where a company would take a twice-a-day pill, change it to a once-a-day pill under a simple supplemental new drug application, and then reset their base date in order to avoid the inflationary penalties. That was what Congress was targeting to do, and some of the language we've talked about, and I want to be clear, I'm not making a meaningless change argument, that's where that came from. It was through gamesmanship that bad actor companies were trying to reset their pricing. It was not about circumstances where companies are out spending hundreds of millions of dollars for innovation on a new product that requires a new drug application. Thank you, Mr. Hughes. Thank you. Thank you both for your arguments. We'll come down and recouncil and adjourn for the day.
judges: Albert Diaz, J. Harvie Wilkinson III, Diana Gribbon Motz